## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**MICHELLE LYNN DALLUGE,**

      **Plaintiff,**

                                    **Civil Action 2:17-cv-645**

**vs.**                               **Judge George C. Smith**

                                      **Chief Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Michelle Lynn Dalluge, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income.  This matter is before the Chief United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 13), the Commissioner's Memorandum in Opposition (ECF No. 18), and the administrative record (ECF No. 8).  For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## I.      BACKGROUND

Plaintiff applied for security disability insurance benefits and supplemental security income in September 2013, asserting disability from congenital heart disease, congestive heart failure, high blood pressure, remissioned ovarian cancer, clinical depression, panic attacks, and

neuropathy, with an alleged onset date of December 9, 2011. (R. at 587-588, 589-595, 627.) Plaintiff's applications were denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 535-543.) Administrative Law Judge Amy Budney (the "ALJ") held a video hearing on January 26, 2016, at which Plaintiff, who was represented by counsel, appeared and testified. (R. at 404-442.) A vocational expert also appeared and testified at the hearing. (R. at 442-448.) On March 4, 2016, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 329–349.) On May 26, 2017, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–7.) Plaintiff then timely commenced the instant action.

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

At the January 2016 administrative hearing, Plaintiff testified that she lived with her significant other. (R. at 405.) At the time of the hearing, Plaintiff testified to a height and weight of 5'6," 247 pounds. (*Id.*) Plaintiff has a driver's license but does not drive "very often." At the time of the hearing, she was not driving due to recent surgery on her right foot. (R. at 405-406.)

After discussing her job history, Plaintiff testified that she believes she cannot work due to "a combination of things." (R. at 411.) She testified to experiencing congenital heart disease, two valve replacement surgeries, "[her] heart's wearing out," loss of function due to chemotherapy treatments, and neuropathy in her hands and feet. (R. at 411-414.) She sees her cardiologist twice a year, unless she is "having some problems." (R. at 423.)

Plaintiff also testified that due to her declining health, she has become "pretty withdrawn." (R. at 415.) Plaintiff testified that she has a lot of friends and used to be "real social." (*Id.*) She further testified that she experiences panic attacks that cause shortness of breath, which began following chemotherapy treatment. (R. at 421.) At the time of the hearing, Plaintiff was also seeing a counselor and psychiatrist who handles her medications once a month. (R. at 421-423.) She feels that she is easily distracted and is often unable to complete tasks in a timely manner. (R. at 428.)

With respect to her daily activities, Plaintiff testified that she has to elevate her legs most of the day, estimating about 10 times per day for 20-30 minutes at a time. (R. at 417.) She can cook, preparing many meals in a crockpot, although her boyfriend does the majority of the cooking. (R. at 419.) She can perform some household chores like sweeping, folding clothes; and small shopping at the grocery store. (R. at 418-420.) She uses Facebook about twice a day. (R. at 431.) According to Plaintiff, she tries to read but sometimes has to reread passages; she described difficulty finishing an entire book. (R. at 432.) She does jigsaw puzzles, dusts, "move[s] things around," and straightens her bookcase. (R. 432-433.)

Plaintiff estimated that she could stand for about 10 minutes and walk for about half a city block before needing to stop and catch her breath. (R. at 420-21.) She indicated that she could lift and carry about ten pounds or less for a short distance. (R. at 425-426.)

**B.**     **Vocational Expert Testimony**

The vocational expert ("VE") testified at the administrative hearing that Plaintiff's past relevant work includes fundraiser, a light exertion, skilled position. (R. at 443.)

The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity ("RFC") to the VE. (R. at 443-447.) Based on Plaintiff's age, education, and work experience, and the RFC ultimately determined by the ALJ, the VE testified that Plaintiff could not perform her past relevant work, but could perform approximately 113,000 unskilled, sedentary jobs in the national economy such as an information clerk, inspector, and order clerk. (R. at 446.) The VE also testified that if the hypothetical individual were to miss two days of work a month, that would be more absences than employers would typically tolerate. (R. at 447.) The VE further testified that if the individual would be off task twenty percent of the workday, it would be work preclusive. (*Id.*)

### III.   MEDICAL RECORDS

**A.  Physical Impairments**

Nicholas Davakis, M.D., F.A.C.C. first treated Plaintiff in April 2011 for dyspnea. Plaintiff underwent a transthoracic echocardiogram which showed mildly reduced right ventricular global systolic function, mild tricuspid regurgitation, and moderate tricuspid stenosis. (R. at 815-816.) Plaintiff underwent another transthoracic echocardiogram on September 28, 2011, which showed an estimated global ejection fraction greater than 65% and mild tricuspid valve stenosis. (R. at 814.)

When seen on December 28, 2011, Dr. Davakis noted that Plaintiff's "cardiac status remains stable although again it quite tenuous given the severity of her valvular disease, arrhythmias and multiple previous surgery." He recommended that she remain on her current regimen. (R. at 806.)

On February 29, 2012, Dr. Davakis reported that Plaintiff "appears to be doing better from an overall clinical standpoint. Her attitude is improved and she appears to be making attempts at exercise. She's had no symptomatic tachyarrhythmias, no chest pain, shortness of breath, orthopnea, PND [paroxysmal nocturnal dyspnea—attacks of severe shortness of breath and coughing that generally occur at night], or other associated cardiac symptoms or complaints. She has been compliant with her medical regimen." (R. at 805.) Dr. Davakis noted that Plaintiff's cardiac examination was remarkable for a normal S1 and S2 with a grade II/VI mid systolic murmur and a loud gallop. (*Id.*) She had no peripheral edema and palpable pulses. (*Id.*) Interrogation of her pacemaker demonstrated appropriate pacing and sensing with no sustained episodes of atrial fibrillation or flutter since her last check and excellent battery status. (*Id.*) Dr. Davakis concluded that "given this woman's extensive disease she actually appears to be doing relatively well. I made no changes in her programming or her medications." (*Id.*)

On April 19, 2013, Dr. Davakis reported that Plaintiff was doing "poorly." (R. at 1442.) She had gained more weight since her last visit and Dr. Davakis noted that she

> appears severely depressed. She remains unemployed and without insurance. She declined interrogation of her pacemaker or an echocardiogram today because of this. From a symptomatic standpoint she is doing reasonably well. She has no orthopnea, PND, no syncope, no chest pain, or other associated cardiac symptoms or complaints.

(Id.) Dr. Davakis concluded that "from a cardiac standpoint this woman is doing reasonably well. Obviously she has multiple other issues which she continues to struggle with." (*Id.*)

On April 16, 2014, Plaintiff returned to Dr. Davakis complaining of dizziness, diaphoresis, fatigue, and occasional overheating while working. (R. at 1605.) She reported that she recently obtained a part time job which has caused her to increase her activity. (*Id.*)

Cardiovascular examination included S1 and S2 with a soft systolic murmur. (*Id*.) Dr. Davakis noted that Plaintiff underwent an echocardiogram earlier in the week which revealed a normal ejection fraction and a normal functioning bioprosthetic tricuspid valve. (R. at 1443, 1605.)

On May 21, 2014, Dr. Davakis reported that Plaintiff had done "reasonably well over the past several years." (R. at 1604.) He noted she previously experienced some shortness of breath and exertional dyspnea, but since returning to work and becoming more active, she had noticed dramatic improvement. (*Id*.) Plaintiff reported that she experienced no symptomatic dysrhythmias, syncope, chest pain, orthopnea, and Dr. Davakis reported Plaintiff's blood pressure was "excellent" at 120/80 and heart rate was 70 and very regular. (*Id*.) Plaintiff's cardiac examination was remarkable for a normal and regular sounding Sl and S2 with mid-systolic murmur at the lower left sternal border as well as a soft gallop. (*Id*.) Dr. Davakis concluded that "symptomatically" Plaintiff was "doing very well given all of the issues she had over the past 10 years." (*Id*.) Dr. Davakis felt Plaintiff's biggest concern was her weight, and they discussed her activity level. (*Id*.) Plaintiff expressed concern about her lower extremity edema. (*Id*.)

On November 5, 2014, Plaintiff complained of fatigue, diuresis, edema, weight gain, dizziness, face turning purple, and intermittent chest pain. (R. at 1603.) Dr. Davakis noted that Plaintiff's lungs were diminished bilaterally, and she had a variable intensity S1 and S2 with distant heart sounds and soft murmur along the left sternal border. (*Id*.) Dr. Davakis opined that Plaintiff's dyspnea, weight gain, and edema appeared to be associated with congestive heart failure. (*Id*.) He further indicated that Plaintiff appeared "very volume overloaded New York

Heart Association (NYHA) class III." (*Id.*) Dr. Davakis added Torsemide to her daily medication regimen and discussed limiting her work to no more than 26 hours per week. (*Id.*)

On November 19, 2014, Dr. Davakis reported that Plaintiff had "done poorly over the past several months." (R. at 1601.) Since her last visit, Plaintiff developed significant fluid retention, began Torsemide, and diuresed nearly 20 pounds with complete resolution of her fluid retention. (*Id.*) Plaintiff also complained of "fairly profound fatigue and decreased exercise tolerance but no orthopnea, PND, syncope or other complaints." (*Id.*) Her blood pressure was mildly elevated at 140/85, her heart rate was 60, and her lungs were clear to auscultation and percussion. (*Id.*) Her cardiac examination was remarkable for a regular, normal sounding S1 and S2 with no audible gallops and a grade II/VI mid systolic murmur at the lower left sternal border. (*Id.*) Dr. Davakis concluded that Plaintiff was "doing poorly symptomatically," and he ordered blood tests and a 24-hour monitor to determine further therapy. (*Id.*)

On February 18, 2015, Plaintiff saw Dr. Davakis for an "urgent visit" due to severe exertional dyspnea, and shortness of breath. (R. at 1600.) Dr. Davakis diagnosed an episode of pericarditis, opined that Plaintiff's orthostatic symptoms were likely medication related, and adjusted her medication. (*Id.*) Plaintiff underwent an EKG which Dr. Davakis interpreted as abnormal, showing right atrial enlargement, right bundle branch block and T wave abnormality, and possible anterolateral ischemia. (R. at 1607.)

Following complaints of worsening dyspnea, decreased activity tolerance, and chest discomfort on May 20, 2015, (R. at 1599), Plaintiff underwent a pulmonary function study on June 4, 2015 which revealed no obstruction with an FEV1/FVC (forced expiratory volume after one second/forced vital capacity): ratio of 81%, and an FEV1 at 71% of predicted. (R. at 1803.)

Lung volumes revealed severe restriction with a TLC (total lung capacity) of 3.09 liters or 57% predicted. (*Id.*) Her ERV (expiratory reserve volume) is very low at 0.38 liters, "which is typical for obesity." (*Id.*) Tests also revealed diffusing capacity reduced at 11.4, or 41 % of predicted, but corrects to 82% of predicted for alveolar volume, suggestive of extrapulmonary restriction, due to obesity, and unremarkable flow-volume loop. (*Id.*)

Plaintiff consulted with a pulmonologist, LeRoy W. Essig, M.D., in September 2015. Plaintiff continued to complain of difficulty breathing, with dyspnea present only with exertion. (R. at 1802.) She denied cough, wheezing, chest tightness or pain, neck tightness, or dysphonia. (*Id.*) Dr. Essig wrote to Dr. Davakis that Plaintiff's dyspnea was primarily due to obesity, deconditioning, and ongoing tobacco abuse. (R.at 1803.) Dr. Essig opined that Plaintiff had no primary pulmonary disease. (*Id.*)

Plaintiff was seen by a nurse practitioner on December 17, 2015, for preoperative clearance for foot surgery. During the evaluation, Plaintiff showed no signs of heart failure, noting she adjusts her Torsemide dose daily to her level of edema. (R. at 1791.)

On January 5, 2016, Dr. Davakis completed a medical source statement. (R. at 1819-23.) Dr. Davakis listed Plaintiff's diagnoses as tricuspid valve replacement, hypertension, congestive heart failure and atrial flutter. (R. at 1891.) Plaintiff's symptoms include shortness of breath, back pain, high blood pressure, fatigue, numbness and tingling, light headedness and dizziness. (*Id.*) Dr. Davakis opined that plaintiff can stand or walk less than two hours during an eight-hour work day and that she can sit for about two hours during an eight-hour work day. (R. at 1820.) According to Dr. Davakis, Plaintiff would need a job that permitted shifting positions at will from sitting, standing or walking. (R. at 1820-21.) Dr. Davakis also opined that Plaintiff would

require an unscheduled fifteen-minute break at least every two hours, and that Plaintiff should elevate her legs to hip level during prolonged sitting. (R. at 1821.) Dr. Davakis further opined that Plaintiff would be off task 25% or more during a typical workday due to her various symptoms. (R. at 1822.) He concluded that, due to her impairments or treatment, Plaintiff would likely be absent from work more than four days per month and was intolerant to heat and cold. (R. at 1823.)

## B. Mental Impairments

### 1. Mental Health America of Franklin County

On April 4, 2014, nurse practitioner, Carrole Roberts, prepared a summary for the agency noting that Plaintiff has been in counseling from November 13, 2013 through April 2, 2014. During that time, Plaintiff had ten one-hour sessions, with two more sessions scheduled. Presenting problems include anger, anxiety, depression, tearfulness, difficulty concentrating, no energy, exhaustion, "at the end of my rope." (R. at 1427.) Plaintiff cannot always fill her prescriptions due to lack of money. (*Id*.) Ms. Roberts noted that Plaintiff is compliant in therapy, obtained work as a pharmacy tech in training for 20-30 hours/week, although she cannot sit at work. (*Id*.) According to Ms. Roberts, Plaintiff

> understands tasks, memory seems good, reports interacting easily with pharmacy shoppers. Can get highly anxious trying to learn new tasks. Like the work. Highly stressed over financial situation that she is trying to address. Concentration time is a problem as her physical fatigue starts to overwhelm.

(R. at 1427-1428.) Ms. Roberts diagnosed Plaintiff with adjustment disorder with mixed anxiety and depressed mood. (R. at 1428.) In October 2014, Plaintiff's primary care physician found her positive for memory impairment anxiety, depression, and anhedonia. (R. at 1749.)

## 2.  North Community Counseling Centers

On October 20, 2014, Plaintiff saw licensed social worker Tammy Barber for ongoing depression.  (R. at 1564-80.)  Plaintiff reported a host of ongoing medical problems, including depression and anxiety.  She reported a years-long depressed mood, problems with sleep, weight gain due to having to take steroids, panic attacks, chest tightening, heart palpitations, fear of losing control, and sweating.  (R. at 1577.)  Plaintiff stated she use to be a very social person, but at the time of this assessment, reported that she rarely participates in anything social to the extent that people no longer even invite her to attend.  (*Id*.)  She reported she has been with the same boyfriend the last 12 or 14 years.  (*Id*.)  Plaintiff said that she has been on antidepressants for many years but feels they are not working well any longer and perhaps she needs something in addition to her current antidepressant.  (*Id*.)  Ms. Barber diagnosed Plaintiff with a mood disorder and generalized anxiety disorder.  (R. at 1578.)

Plaintiff underwent an initial psychiatric evaluation with Angela Johnson, M.D. on November 18, 2014.  (R. at 1581-1585.)  Plaintiff endorsed depressive symptoms including fatigue, low motivation, appetite is decreased, trouble concentrating, low mood, and feelings of hopelessness, worthlessness, and helplessness.  (R. at 1581.)  Upon examination, Dr. Johnson found Plaintiff was alert and oriented x 3, was dressed appropriately for the weather, ambulated without assistance, and had no psychomotor agitation.  (R. at 1583.)  Dr. Johnson also found Plaintiff appeared her stated age, displayed cooperative behavior, had normal speech rate, rhythm, and volume, maintained eye contact, and had a "depressed" mood and reactive affect.  (*Id*.)  Dr. Johnson further found Plaintiff denied suicidal or homicidal ideation or hallucinations, had linear and logical thought process/associations, had good memory, insight, judgment and

intact impulse control.  (*Id.*)  Dr. Johnson diagnosed a mood disorder, anxiety state, and generalized anxiety disorder.  (*Id.*)

The record shows that Dr. Johnson continued to treat Plaintiff.  (R. at 1586-1597.)  By February 2015, Plaintiff reported she has been seen for psychotherapy.  Plaintiff reported that, with Ritalin, she is able to do household chores, does not have crying episodes, and manages 6-8 hours of sleep per night.  (R. at 1592.)  Plaintiff reported to Dr. Johnson in March 2015 that Ritalin was still helping.  (R. at 1595.)  Upon examination, Dr. Johnson found her mood improved, affect reactive, and appearance appropriate.  (*Id.*)  She denied suicidal or homicidal ideation or hallucinations.  (*Id.*)

On January 18, 2016, Dr. Johnson completed a mental impairment questionnaire in which she listed Plaintiff's diagnoses as major depressive disorder and generalized anxiety disorder. (R. at 1834.)   Dr. Johnson found that Plaintiff has difficulty maintaining focus, easy distractibility, frequent crying episodes, difficulty with short term memory, depression, anxiety, and some inability to complete tasks.  (*Id.*)  Dr. Johnson found Plaintiff markedly limited in her ability to remember work-like procedures, maintain regular attendance, work with others, make simple work-related decisions, perform at a consistent pace, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in a routine work setting, deal with normal work stress, understand, remember, and carry out detailed instructions, and deal with stress of semiskilled and skilled work.  (R. at 1836-1837.) Dr. Johnson also found Plaintiff limited in her ability to understand and remember very short and simple instructions, sustain an ordinary routine without special supervision, ask simple questions

or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and be aware of normal hazards and take appropriate precautions, set realistic goals or make plans independently of others, and interact appropriately with the general public.  (*Id*.)  Dr. Johnson opined that Plaintiff had moderate restrictions in activities of daily living, no difficulties in social functioning, marked difficulties in maintaining concentration, persistence and pace, with three episodes of decompensation of at least two weeks' duration.  (R. at 1838.)

### 3.  State Agency Review

In January 2014, Irma Johnston, Psy.D., reviewed Plaintiff's record for the state agency pursuant to her application for benefits.  (R. at 452-462.)  Dr. Johnston opined that Plaintiff had mild limitations in activities of daily living, mild difficulties in social functioning, moderate limitations in concentration, persistence and pace, and no episodes of decompensation of extended duration.  (R. at 458.)  She opined that Plaintiff is capable of sustaining concentration and persistence to complete simple one- and two-step repetitive tasks in settings where there is no demand for a fast pace and is capable of work that does not have strict production standards or frequent changes.  (R. at 462.)  Dr. Johnston found Plaintiff's statements partially credible. (R. at 459.)  In April 2014, Robyn Hoffman, Ph.D., reviewed Plaintiff's record upon reconsideration and affirmed Dr. Johnston's assessment.  (R. at 479-490.)

### IV.  THE ADMINISTRATIVE DECISION

On March 4, 2016, the ALJ issued her decision.  (R. at 329-349.)  The ALJ found Plaintiff meets the insured status requirements through December 31, 2018.  At step one of the

sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially

gainful activity since December 9, 2011, the alleged onset date. (R. at 331.) The ALJ also found

that Plaintiff has the following severe impairments: history of Ebstein's anomaly of the bicuspid

valve; history of congenital heart disease; history of congestive heart failure; status post

implantation of cardiac pacemaker; cardiomegaly; history of ovarian cancer, stage 1C, grade 3;

peripheral neuropathy of the upper extremities, status post chemotherapy; obesity; generalized

anxiety disorder; major depressive disorder; and, mood disorder. (R. at 332.) The ALJ

determined that Plaintiff's small internal hemorrhoid; hepatic flexure polyp; obstructive sleep

apnea; hypertension; alcohol abuse (in remission); abscess; eczema; dermatitis; rosacea; wart;

rash; lichen sclerosis et atrophicus; prurigo nodularis; Gastroesophageal Reflux Disease

(GERD); hypothyroidism; paronychia/onychia of the right, hallux; atrial flutter; chronic

cholecystitis; pancreatitis; gastritis; gallstones; and fracture of the toe on the right foot are not

severe impairments. (*Id.*) She further found that Plaintiff did not have an impairment or

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence. *See* 20 C.F.R. §416.920(a)(4). Although a dispositive
finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th
Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or
   equal the criteria of an impairment set forth in the Commissioner's Listing of
   Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant
   perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual
   functional capacity, can the claimant perform other work available in the national
   economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);

combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 335.) The ALJ assessed the severity of Plaintiff's impairments by comparing the medical evidence to the requirements of the following listings: 4.02 Chronic Heart Failure; 4.04 - Ischemic Heart Disease; 4.06 - Symptomatic congenital heart disease; 11.14 – Peripheral Neuropathies; 12.04 Affective Disorders; 12.06 Anxiety-related Disorders; 13.23 Cancers of the female genital tract. (R. at 335-39.)

At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

After careful consideration of the entire record, the undersigned finds that the [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), subject to the following limitations. [Plaintiff] can lift/carry/push/pull 10 pounds occasionally and less than 10 pounds frequently. [Plaintiff] can sit for 6 hours, stand for 2 hours, and walk for 2 hours. [Plaintiff] can change positions every 30 minutes for 1-2 minutes within the immediate vicinity of the workstation. [Plaintiff] can frequently use foot controls on right. [Plaintiff] can frequently use hand controls on the left and right. [Plaintiff] can frequently handle, finger, and feel on the left and right. [Plaintiff] can occasionally climb ramps and stairs, kneel, and crouch. [Plaintiff] can frequently stoop. [Plaintiff] should never climb ladders, ropes, and scaffolds, or crawl. [Plaintiff] should never be exposed to unprotected heights or dangerous moving mechanical parts. [Plaintiff] can frequently be exposed to dust, odors, fumes, and pulmonary irritants. [Plaintiff] can understand, remember, and carry out simple, routine, and repetitive tasks, but not at a production rate pace (e.g., assembly line work). [Plaintiff] can understand, remember, and carry out simple work-related decisions. Changes should be well explained and introduced slowly. Instructions should be in writing.

(R. at 339.) In making her RFC determination, the ALJ gave Dr. Davakis' December 2015 opinion "little weight," finding it "inconsistent with the bulk of the medical record" and stating that Dr. Davakis "only saw the claimant a few times, and as such, the scope of his opinions is

---

*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

necessarily narrow." (R. at 345.) The ALJ also stated that final authority for determination of residual functional capacity rests with the Commissioner. (*Id.*) With respect to Dr. Davakis' November 2014 opinion, the ALJ explained that Dr. Davakis "failed to express his opinion in precise, functional terms" and he "failed to present specific evidence supportive of his opinion, limiting its probative value." (*Id.*)

In determining Plaintiff's mental RFC, the ALJ afforded the opinions of the state agency psychologist "great weight" noting that both Dr. Johnston and Dr. Hoffman reviewed the entirety of the record as it then existed and both were highly skilled medical professionals who are experts in Social Security issues. (R. at 346.) The ALJ assigned "little weight" to Dr. Johnson's opinion, finding it "inconsistent with the bulk of the medical record." (*Id.*)

Relying on the VE's testimony, the ALJ concluded that Plaintiff is unable to perform her past relevant work but can perform jobs that exist in significant numbers in the national economy. (R. at 347-348.) She therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 348.)

## V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286

(6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley

v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th

Cir. 2007)).

## VI. ANALYSIS

In her Statement of Errors, Plaintiff argues that the ALJ erred in assessing the opinion

evidence of record, specifically in her decision to afford "little weight" to the medical opinions

of her treating cardiologist, Dr. Davakis, and treating psychiatrist, Dr. Johnson. (ECF No. 13 at

pp. 5-13.) In evaluating a claimant's case, the ALJ must consider all medical opinions that she

receives. 20 C.F.R. § 416.927(c). Medical opinions include any "statements from physicians

and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ." 20 C.F.R. § 416.927(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the [claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id*. Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to

any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 f.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544-45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

**1. Dr. Davakis' December 17, 2015, Medical Source Statement**

In her opinion, the ALJ listed several *Wilson* factors that influenced her decision to give Dr. Davakis' December 17, 2015, medical source statement "little weight." Specifically, the ALJ found Dr. Davakis' opinion "inconsistent with the bulk of the medical record, which does

not support all of the limitations mentioned." (R. at 345.) The ALJ also found that Dr. Davakis "only saw the claimant a few times, and as such, the scope of his opinions is necessarily narrow." (*Id*.)

Contrary to Defendant's assertions, the record reveals that, prior to completing his medical source statement, Dr. Davakis had treated Plaintiff since at least April 2011. (R. at 815.) During that time, Dr. Davakis saw Plaintiff at least nine times. (R. at 805-806, 815-816, 1442-1443, 1601-1607.) In addition, Dr. Davakis received assessments from consulting physicians concerning Plaintiff's conditions. (R. at 1801-1804.) In summarizing Dr. Davakis findings, the ALJ remarked that, prior to May 2014, "Dr. Davakis had not seen the claimant in several years." (R. at 342.) A cursory review of the record, however, reveals that Dr. Davakis saw Plaintiff in April 2013 and April 2014. (R. at 1442-1443, 1605.) The ALJ, therefore, was clearly factually incorrect.

More significantly, however, Dr. Davakis' opinion evidence is not as inconsistent with the bulk of the medical record as the ALJ believes. (R. at 345.) An examination of the medical record suggests a claimant who showed uneven progress during the 2011-2015 period. From 2011 to 2013, Dr. Davakis' records show that Plaintiff did indeed do "better from an overall clinical standpoint." (R. at 805.) In April 2013, Plaintiff had "no orthopnea, PND, no syncope, no chest pain, or other associated cardiac symptoms or complaints." (R. at 1442.) After April 2013, however, the record suggests an overall deterioration in Plaintiff's condition, exacerbated by her obesity.

When Plaintiff complained of overheating and fatigue from working in April 2014, Dr. Davakis noted "S1 and S2 with a soft systolic murmur." (R. at 1605.) In May 2014, Dr. Davakis

19

observed normal cardiac test results and found that "symptomatically," Plaintiff was "doing very well given all of the issues she had over the past 10 years." (R. at 1604.) By November 2014, however, Dr. Davakis noted objective medical findings indicating that Plaintiffs' lungs were diminished bilaterally, and she had a variable intensity S1 and S2 with distant heart sounds and a soft murmur along the left sternal border. (R. at 1603.) Two weeks later, Dr. Davakis reported that Plaintiff had "done poorly over the past several months," retained significant amounts of fluid, experienced profound fatigue, mildly elevated blood pressure, and a grade II/VI mid systolic murmur at the lower left sternal border. (R. at 1601.) Dr. Davakis concluded that Plaintiff was "doing poorly symptomatically." (*Id*.)

In February 2015, Dr. Davakis saw Plaintiff for an "urgent visit" due to severe exertional dyspnea and shortness of breath." (R. at 1600.) Dr. Davakis found that Plaintiff was suffering an episode of pericarditis, related to her medication regime, and an EKG showed right atrial enlargement, right bundle branch block, and T wave abnormality. (R. at 1607.) In May 2015, Plaintiff's tests suggested extrapulmonary restriction due to obesity, and in September 2015 the consulting pulmonologist found dyspnea due to obesity. (R. at 1801-1804.)

Considering the objective medical evidence in the record, it cannot be said that Dr. Davakis' medical opinion evidence conflicts with "the bulk" of the medical record. In determining whether Dr. Davakis' medical opinion conflicts with the other record evidence, it is not to be expected that a medical source statement made after a period of physical deterioration would reflect the objective medical evidence of a prior period of physical improvement. The ALJ, however, appears to base her findings on just such a comparison. Dr. Davakis' medical source statement reflects his opinion of Plaintiff's impairments and abilities at a certain point in

time, namely after a period of gradual but pronounced physical decline. The Undersigned cannot conclude that Dr. Davakis' medical source statement is inconsistent with the record evidence, particularly the record evidence from late 2014 through 2015, which showed a general deterioration in Plaintiff's overall condition. Moreover, the ALJ has not presented "good reasons" supported by substantial evidence for finding that Dr. Davakis' opinion is inconsistent with the medical evidence from the 2014-2015 period. *Wilson*, 378 F.3d at 544-45. The Undersigned finds, therefore, that the ALJ's treatment of Dr. Davakis' treating source opinion is not supported by substantial evidence.

## 2. The ALJ's Indirect attack on Dr. Davakis' Opinion Evidence

Defendant argues that, even if the ALJ failed to give good reasons for rejecting Dr. Davakis' treating source statement, she effectively attacked the supportability and consistency of his statement in other parts of her opinion. (ECF No. 18 at 6.) Specifically, Defendant avers that Plaintiff's testimony about her activities of daily living contradicts Dr. Davakis opinion evidence. (*Id*.)

The Court notes that the ALJ's opinion states only that Plaintiff's testimony regarding her daily activities undermines her credibility as a witness. (R. at 340.) Nowhere in a rather lengthy opinion does the ALJ state a finding that Plaintiff's testimony contradicts Dr. Davakis' opinions. Turning to Plaintiff's testimony, moreover, the Undersigned finds that it is not, in fact, inconsistent with Dr. Davakis' December 2015 opinion.

Dr. Davakis opined that Plaintiff can sit for one hour and stand for thirty minutes at a time. (R. at 1820.) He also opined that Plaintiff can stand or walk less than two hours and sit about two hours in an eight-hour day with normal breaks. (*Id*.) Dr. Davakis further opined that

Plaintiff would need an unscheduled 15-minute break at least every two hours and that she should elevate her legs when sitting for prolonged periods. (R. at 1821.) He also opined that Plaintiff could lift and carry less than ten pounds rarely, and more than that never. (R. at 1822.)

The ALJ characterizes Plaintiff's activities of daily life as "robust." (R. at 340.) In reality, they amount to personal care, cooking, performing "some household chores like sweeping," folding clothes, doing "small shopping at stores," paying her bills, driving a car, and attending doctor's appointments. (R. at 337.) A comparison of these "robust" activities of daily life with Dr. Davakis' opinion evidence reveals that his opined restrictions do not conflict with Plaintiff's testimony. None of the reported activities of daily life would require exertion beyond Dr. Davakis' opined limitations and many can be accomplished with much less. Defendant's *post hoc* assertions to the contrary, the ALJ's opinion does not indirectly undermine the supportability or consistency of Dr. Davakis' treating source opinion.

The Undersigned finds, therefore that substantial evidence does not support the ALJ's findings with respect to Dr. Davakis' December 2015 medical source statement. Accordingly, the Undersigned cannot conclude that substantial evidence supports the ALJ's ultimate RFC and disability determinations.[2]

## VII.  CONCLUSION

For the reasons explained above, the Undersigned finds that substantial evidence does not support the ALJ's treatment of Dr. Davakis' treating source opinion evidence. Consequently, the Undersigned cannot conclude that the resulting RFC and disability determinations are supported

---

[2] This finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error. The Court notes, however, Plaintiff's contention that the ALJ failed to properly evaluate the other treating source opinion evidence of record. The Undersigned need not, and does not,

by substantial evidence.  Any error in this regard, therefore, is not harmless.  It is

**RECOMMENDED** that the Commissioner's decisions be **REVERSED** and that this action be

**REMANDED** to the Commissioner and the ALJ under Sentence Four of § 405(g).

## VIII.   PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

---

resolve the alternative bases that Plaintiff asserts in support of reversal and remand.

Date: July 18, 2018                                */s/ Elizabeth A. Preston Deavers*
ELIZABETH A. PRESTON DEAVERS
CHIEF UNITED STATES MAGISTRATE JUDGE